IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020

**ALBERTO CONDE-VALENTINO v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County
No. 2012-C-2035    Angelita Blackshear Dalton, Judge**

———————————————————

**No. M2019-00617-CCA-R3-PC**

———————————————————

The Petitioner, Alberto Conde-Valentino, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief, seeking relief from his convictions of first degree felony murder and especially aggravated robbery and resulting effective sentence of life in confinement. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

David M. Hopkins (on appeal and at hearing), Murfreesboro, Tennessee, for the appellant, Alberto Conde-Valentino.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In July 2012, the Davidson County Grand Jury indicted Rodney Earl Jones, Xavier Tull-Morales, and the Petitioner for first degree felony murder and especially aggravated robbery. The charges resulted from the fatal shooting and robbery of Victor M. Parham. State v. Alberto Conde-Valentino, No. M2015-01872-CCA-R3-CD, 2016 WL 5799794, at *1 (Tenn. Crim. App. at Nashville, Oct. 4, 2016), perm. app. denied, (Tenn. Jan. 19, 2017). The Petitioner and his codefendants were tried jointly in February 2014. See id.

According to the proof at trial, the victim and Jones used to be roommates, and Jones knew that the victim, who owned a lawn-care business and sold drugs, carried large sums of money. Id. On March 15, 2012, the victim's girlfriend found him dead in his apartment. Id. She had been unable to contact him since the previous day. See id. A forensic pathologist testified that the victim had been shot six times and that he died about noon on March 14. Id. at *6.

Antwoine Jobe, a childhood friend of Jones, testified that one day in March 2012, he saw the Petitioner and Tull-Morales with Jones in Jones's SUV. Id. at *3. Jones told Jobe that "'we fixin' to get ready to rob Little Vic,'" meaning the victim. Id. Jobe "spent 20 to 30 minutes counseling Mr. Jones against the robbery," and Jobe thought he had changed Jones's mind. Id. Later that evening, though, Jones telephoned Jobe and told him, "'I should have listened to you. Little Vic might be dead.'" Id. Jobe said Jones sounded "'nervous'" and "'[s]cared.'" Id.

Iris Pinson testified that in March 2012, she and Tull-Morales were neighbors. Id. at *4. Pinson said that she thought Tull-Morales had "a romantic interest in her" but that they were just friends. Id. Pinson was "acquainted" with Jones and knew him to spend time with Tull-Morales and the Petitioner. Id. This court then described Pinson's testimony as follows:

> On an unspecified morning in March of 2012, the defendant, Mr. Tull-Morales, and Mr. Jones came to Ms. Pinson's residence, and both the defendant and Mr. Tull-Morales told Ms. Pinson that they intended to rob someone. Ms. Pinson recalled that the defendant "was really excited and hyped" about the prospect of the robbery. Mr. Jones "talk[ed] about what they were going to get from the robbery," which was "[d]rugs and money." When the three men left Ms. Pinson's residence, Ms. Pinson saw that both the defendant and Mr. Jones had guns "in plain view." Mr. Tull-Morales told Ms. Pinson that he, too, had a gun, but she "knew that he didn't have any money to buy a gun."

> Ms. Pinson saw the three men leave in Mr. Jones's black SUV. The men returned to Ms. Pinson's home after it was dark outside. Ms. Pinson noticed that Mr. Tull-Morales "had a lot of blood" on "his hands, on his shirt" and that he was in possession of "a lot of money" and two "[b]aggies" of drugs, "one with some cocaine in it and there was one with a bunch of pills in it." The defendant had "a similar amount" of blood to that of Mr. Tull-Morales on his shirt and hands, and the defendant "was really nervous and shaky" and "kept saying that he was going to go to jail." Mr. Jones "just had

- 2 -

a little blood on his hands and [it was] kind of smeared, but he wasn't like [Mr. Tull-Morales] and [the defendant]."

Ms. Pinson testified about the events of the day as described by Tull-Morales:

> He told me that he waited in the car for a really long time and then he told me that he went up the stairs and knocked on the door and said that he had to go to the bathroom. He was let in and he said that the couch was sitting this way and he said he walked past [the victim] and got his attention and he shot him. He said he blew his face off.

The defendant described the events to Ms. Pinson thusly:

> He said he walked in - he walked up the stairs, knocked on the door and was let in and he said, uh, he ran around the couch and he was stabbed, I don't remember if he said [Mr. Jones] or him did it, but he said that he stabbed him and he said he unloaded on him.

The defendant "threw up all over the place," including "upstairs" in Ms. Pinson's residence and "more than once off of the back porch." According to Ms. Pinson, the three men argued because the money and drugs had already been divided, and Mr. Tull-Morales and the defendant believed that they "didn't get their fair share."

. . . .

Ms. Pinson made the three men leave her residence "as fast as [she] could." Ms. Pinson explained that she did not contact the police that night because she was "scared," explaining that she lived "in the middle of horrible projects by [her]self with [her] two kids and [her] sister and they live right behind [her] and both of them have friends, multiple friends there." Ms. Pinson believed that "she would have been hurt with [her] kids."

. . . .

Approximately six weeks later, Ms. Pinson contacted the police and told them everything she knew about the victim's murder. At the behest of the police officers, she attempted a controlled telephone call to Mr. Tull-

- 3 -

Morales, but he did not answer the call. Two days later, using a recording device given to her by the police, Ms. Pinson recorded a telephone conversation with Mr. Tull-Morales, during which Mr. Tull-Morales reiterated that he had "walked up the stairs, . . . he knocked on the door and said he had to go to the bathroom, walked inside and shot him."

Id. at *4-5. A special agent from the Tennessee Bureau of Investigation (TBI) testified as an expert in forensic biology that a swab collected from "'the hallway door of the crime scene'" matched the Petitioner's DNA profile. Id. at *6.

None of the defendants presented any proof, and the jury convicted the Petitioner as charged in the indictment of first degree felony murder and especially aggravated robbery. Id. The trial court sentenced him to life for the murder conviction. Id. After a sentencing hearing, the trial court imposed a concurrent fifteen-year sentence for especially aggravated robbery. Id.

On direct appeal of his convictions, the Petitioner claimed that the trial court erred by denying his motion to sever his trial from that of his codefendants, that the trial court erred by refusing to instruct the jury that Jobe was an accomplice, and that the evidence was insufficient to support the convictions. Id. at *7. This court concluded that the trial court did not abuse its discretion by denying the Petitioner's motion to sever; that the proof did not warrant an accomplice instruction for Jobe; and that the evidence was sufficient to show that the Petitioner, even if he was not the shooter, was criminally responsible for the acts of his codefendants. Id. at *10, 11, 13.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel, and counsel filed three amended petitions. Relevant to this appeal, post-conviction counsel alleged in the third amended petition that trial counsel was ineffective because he failed to present evidence at trial that the Petitioner did not speak English, which made his conversations with Pinson impossible; that trial counsel failed to explain to the Petitioner the facts of the case, the evidence against him, and his options regarding a trial or a plea bargain; that trial counsel failed to present evidence at trial to show the Petitioner's DNA could have been transferred to the crime scene without his being present at the crime scene; and that trial counsel failed to argue to the jury that Pinson was an accomplice to the charged crimes and request an accomplice instruction as to Pinson.

At the evidentiary hearing, the twenty-six-year-old Petitioner testified through an interpreter that he was born in Ponce, Puerto Rico, and that he moved to the United States when he was about seventeen years old. The Petitioner went to school in the United States but attended Spanish-speaking classes. He said that he had "[a] lot" of problems in school

because he had difficulty understanding, writing, and reading English and that he was "held back" one grade. The Petitioner did not graduate from high school and had no experience with the criminal justice system prior to this case.

The Petitioner testified that trial counsel was appointed to represent him and that trial counsel met with him "[v]ery few times" before trial. Trial counsel spoke English to the Petitioner and used an interpreter. Trial counsel used the same interpreter at every meeting. Post-conviction counsel asked if the Petitioner had "difficulty" understanding the interpreter, and the Petitioner answered, "Yes, because of his accent." The Petitioner said that trial counsel should have presented evidence at trial that the Petitioner did not speak English. The Petitioner said that the evidence would have been "very important" because Pinson claimed she had conversations with the Petitioner. However, those conversations were impossible because the Petitioner could not speak English. The Petitioner said that Pinson and Tull-Morales "were a couple" but that Pinson did not know the Petitioner.

The Petitioner testified that trial counsel did not explain the proof against him or the plea bargain process. The Petitioner did not know what Pinson was going to say at trial or that the State was going to present DNA evidence. The Petitioner did not understand the theory of criminal responsibility, and trial counsel did not explain the theory to him. Had trial counsel done so, the Petitioner would not have gone to trial and would have been willing to accept a plea bargain. The Petitioner also did not know he was facing life in prison if convicted. Had he known about the punishment, he would not have wanted to go to trial.

The Petitioner testified that trial counsel should have presented evidence at trial to explain how the Petitioner's DNA was transferred to the crime scene without his having been there. The Petitioner acknowledged that he had been in Jones's SUV "a number of times" and that his codefendants could have transferred his DNA to the victim's apartment. However, trial counsel did not ask the State's expert about the transfer of DNA. The Petitioner said trial counsel's doing so would have made "a lot" of difference at trial.

The Petitioner testified that Pinson claimed the three defendants planned the robbery while they were in her house, returned to her house after the robbery, and divided the money and drugs in her home. Trial counsel failed to argue, though, that Pinson was an accomplice or request an accomplice instruction for her testimony.

On cross-examination, the Petitioner testified that Pinson claimed she spoke to him in English. The Petitioner said that Tull-Morales was from Puerto Rico and that Tull-Morales spoke Spanish. The Petitioner acknowledged that Pinson and Tull-Morales were in a relationship even though they spoke different languages. The Petitioner also acknowledged that Pinson was not the only witness to testify about seeing him with Jones

and Tull-Morales on the day of the robbery. Specifically, Jobe testified that he saw the Petitioner and Tull-Morales in Jones's SUV prior to the robbery.

The Petitioner testified that trial counsel met with him in jail five or six times and that the Petitioner spoke with trial counsel's interpreter, Luis Acevedo, at those meetings. Acevedo told the Petitioner that Acevedo was born and raised in Puerto Rico. However, the Petitioner could not understand Acevedo, so the Petitioner did not learn anything about his case. The Petitioner acknowledged that Acevedo was not the interpreter at court proceedings. The Petitioner had different interpreters at court proceedings and understood those interpreters "[s]o so." He said he was not having any trouble understanding the interpreter at the post-conviction evidentiary hearing.

The Petitioner testified that he did not remember trial counsel's discussing the State's DNA evidence with him and that trial counsel should have asked the State's expert if it was possible the Petitioner's DNA was transferred to the crime scene by someone else. Trial counsel told the Petitioner about "the charge" but never told the Petitioner about his potential punishment. Trial counsel also did not talk with the Petitioner about the facts of the case or ask if the Petitioner knew the victim. The Petitioner told trial counsel that he was innocent and that everyone was lying.

The Petitioner acknowledged that he claimed he was never in Jones's truck. The State then asked him, "So how could [trial counsel] have suggested that by you riding in the truck your DNA somehow got there and that is how it got to the crime scene?" The Petitioner answered, "I don't know."

The Petitioner acknowledged that Pinson never testified that she helped plan the robbery or shared in the proceeds. He said, though, "But she said that, she did say that she was present when supposedly we split the money. . . . Which makes her an accomplice." Although Pinson contacted the police, she lied to them by claiming Tull-Morales was in California when he actually was in Tampa, Florida.

On redirect examination, the Petitioner acknowledged that Tull-Morales spoke "some English," that Tull-Morales was "a lot more fluent in English" than the Petitioner, and that Tull-Morales was able to communicate with Pinson in English. Jones could not speak Spanish, so the Petitioner could not speak directly to Jones. Instead, Tull-Morales would communicate to Jones and then communicate to the Petitioner. Trial counsel could have called the Petitioner's mother to testify that the Petitioner did not speak English. The Petitioner said he did not remember ever being in Jones's truck prior to the robbery.

Trial counsel testified for the State that he used to work in private practice, focusing on criminal law and delinquency. He then went to work for the public defender's office

and worked there about twenty-eight years. He was working for the public defender's office when he was appointed to represent the Petitioner. Trial counsel said that it was "common" for his clients to speak Spanish. Trial counsel sometimes used a Spanish-speaking attorney or a Spanish-speaking investigator to help with a case. In this case, trial counsel used a Spanish-speaking investigator, Luis Acevedo. Acevedo was from Puerto Rico.

Trial counsel testified that the Petitioner spoke "some English" and that he could communicate with the Petitioner "on very simple things in English." Trial counsel said he also thought that the Petitioner gave him several notes written in English during the trial. Trial counsel stated that the Petitioner had attended an English-speaking high school in the United States but that the Petitioner "didn't do very well there." Trial counsel "might" have spoken to the Petitioner in English once or twice, but trial counsel did not speak with the Petitioner in English "on anything material." Trial counsel acknowledged that any substantive conversations with the Petitioner occurred through Acevedo.

Trial counsel testified that the Petitioner denied having any conversations with Pinson; therefore, "we didn't really have a very thorough discussion on whether or not he could have understood something that he said that he didn't hear or never took place." Trial counsel said he did not remember the Petitioner's claiming that he could not converse with anyone in English.

Trial counsel testified that according to his records, he met with the Petitioner a total of twenty-one times. During their meetings, trial counsel explained the facts of the case and the State's theory to the Petitioner. Trial counsel said he thought the Petitioner understood the State's theory because the Petitioner was "able to deny" participating in the crimes. Acevedo accompanied trial counsel when trial counsel met with the Petitioner in jail, and Acevedo met with the Petitioner one time without trial counsel in order to review discovery with the Petitioner. The discovery materials were provided to the Petitioner, and Acevedo interpreted the materials to him. The Petitioner never indicated to trial counsel that he was having trouble understanding Acevedo. Had the Petitioner done so, trial counsel would have "[tried] to address it in some way." Trial counsel said that the Petitioner and Acevedo were both from Puerto Rico and that he was "very surprised" the Petitioner could not understand Acevedo.

Trial counsel testified that the State did not make a plea offer to the Petitioner. Trial counsel said that the Petitioner's position was that he was "completely innocent" and that the Petitioner denied "almost everything." Trial counsel said that he thought the Petitioner had "a good grasp of the importance of [Pinson's] testimony" and acknowledged that the State's DNA evidence was "a major obstacle." Trial counsel said that he did not know if the Petitioner understood "the concept of DNA" but that the Petitioner understood the State

- 7 -

was going to prove his blood was found in the victim's apartment. The Petitioner denied he had been in the victim's apartment and thought the State's TBI expert was lying. Trial counsel obtained an independent expert, and the independent expert reviewed the TBI's DNA report.

Trial counsel acknowledged that the State could not prove who shot the victim. Trial counsel said that he did not specifically remember explaining the theory of criminal responsibility to the Petitioner but that "it would have been my custom and practice to do so." Trial counsel requested an accomplice instruction for Jobe and raised the accomplice issue on appeal. Trial counsel said that Pinson had a "personal relationship" with Tull-Morales and that they may have had a child together but that trial counsel did not consider arguing Pinson was an accomplice. Post-conviction counsel asked if trial counsel should have asked for an accomplice instruction with regard to Pinson, and trial counsel answered, "I would agree that that would be a request that might have some merit, yes."

On cross-examination, trial counsel acknowledged that Pinson claimed the defendants planned the robbery in her apartment. Pinson also claimed that she was present when they planned the robbery, that they divided the proceeds of the robbery in her apartment, and that they cleaned up blood evidence in her apartment. Moreover, Pinson did not call the police for "some significant period of time."

Trial counsel testified that he did not go over discovery materials with Acevedo and acknowledged that Acevedo was not an attorney. Trial counsel said that the Petitioner "was having difficulty understanding how he could have been responsible in the law for this killing" and that trial counsel did not have any independent recollection of explaining the theory of criminal responsibility to the Petitioner. Trial counsel acknowledged that transfer DNA could be a defense when DNA inexplicably ended up in a location. The Petitioner denied being at the crime scene, but trial counsel did not ask the TBI expert whether the Petitioner's DNA could have been transferred to the victim's apartment.

Trial counsel testified that the Petitioner had a ninth-grade education when he was eighteen years old and that the Petitioner had "extensive absences" from school. Trial counsel did not speak with Pinson before trial and did not try to impeach her claim that she spoke English to the Petitioner. He said that he "didn't want to test her Spanish speaking abilities" in front of the jury but that "that may have been an error." During the trial, someone at counsel table handed trial counsel several notes. The notes were written in English but "weren't well written." Trial counsel acknowledged that an interpreter sat next to him at counsel table but said that he did not think the interpreter wrote the notes.

Madeline Valentino, the Petitioner's mother, testified for the Petitioner that he grew up in Puerto Rico. Valentino spoke English, but the Petitioner spoke only Spanish while

he was growing up. The Petitioner came to Tennessee when he was fifteen or sixteen years old. Valentino acknowledged that the Petitioner went to school in Tennessee but said that he had difficulty in school due to his inability to speak English. The Petitioner did not graduate from high school and still did not speak English. Valentino said that she talked with trial counsel "maybe two times" before trial and that they discussed the Petitioner's inability to speak English.

On cross-examination, Valentino testified that she was born in New Jersey and that she had always spoken English. However, she never taught the Petitioner to speak English. The Petitioner came to Tennessee with Valentino. At the time of the evidentiary hearing, Valentino had been in Tennessee about nine years. She said that she visited the Petitioner in jail before his trial and that he told her that he did not understand trial counsel's interpreter.

In a written order, the post-conviction court denied the petition for post-conviction relief. As to the Petitioner's claim that trial counsel was ineffective for failing to present evidence at trial that the Petitioner could not speak English, the post-conviction court recounted trial counsel's testimony that he spoke English to the Petitioner about "simple things," that trial counsel thought the Petitioner spoke "some English," and that the Petitioner did not tell trial counsel he could not speak English. The post-conviction court implicitly accredited trial counsel's testimony and concluded that the Petitioner failed to demonstrate deficient performance. The post-conviction court also noted trial counsel's testimony that he did not want to test Pinson's ability to speak Spanish in front of the jury. The post-conviction court concluded that trial counsel made a strategic decision not to question Pinson about her ability to speak Spanish with the Petitioner. Finally, the post-conviction court determined that even if trial counsel was deficient, the Petitioner failed to show that the outcome of his trial would have been different because Jobe testified that he saw the Petitioner in Jones's SUV prior to the robbery and because the Petitioner's DNA was found at the crime scene.

As to the Petitioner's claim that trial counsel was ineffective for failing to explain the facts of the case, the State's evidence, the theory of criminal responsibility, and plea proceedings to the Petitioner, the post-conviction court again implicitly accredited trial counsel's testimony that he met with the Petitioner twenty-one times, that he used an interpreter at each meeting, that the interpreter met with the Petitioner to review discovery, and that the Petitioner did not tell trial counsel he could not understand the interpreter. The post-conviction court noted that trial counsel did not have an independent recollection of explaining criminal responsibility to the Petitioner. However, the post-conviction court concluded that given trial counsel's communications with the Petitioner, the Petitioner failed to show trial counsel was deficient. The post-conviction court also concluded that given the Petitioner's claim that he was innocent of the charges and that all the witnesses

were lying, "it would be difficult to show that a plea bargain could have been reached in this case." Thus, the post-conviction court determined that the Petitioner failed to show that trial counsel was deficient.

Regarding the Petitioner's claim that trial counsel was ineffective for failing to present evidence about the transfer of his DNA to the crime scene, the post-conviction court found that trial counsel was not deficient because trial counsel had an independent expert review the DNA report, and trial counsel did not think the State's DNA evidence could be successfully challenged. The post-conviction court concluded that even if trial counsel was deficient, the Petitioner failed to show that the transfer of his DNA was a viable defense because the Petitioner did not present any expert testimony or proof of the transfer at the evidentiary hearing.

Last, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to argue at trial that Pinson was an accomplice or request an accomplice instruction for Pinson. The post-conviction court found that even though the planning of the robbery and the division of the proceeds occurred in Pinson's home, the Petitioner failed to show that Pinson was an accomplice because there was no proof that she participated in the crimes. Accordingly, the post-conviction court concluded that the Petitioner failed to demonstrate that trial counsel was deficient for not arguing Pinson was an accomplice or requesting an accomplice instruction. The post-conviction court denied the petition for post-conviction relief, and the Petitioner appeals the ruling of the post-conviction court.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction

court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner claims that trial counsel was ineffective because trial counsel failed to present evidence at trial that he did not speak English, which would have shown that the conversations he allegedly had with Pinson were "linguistically impossible." Our review of the trial transcript confirms that Pinson testified that she spoke English with Tull-Morales and the Petitioner. The State asked how she was able to converse with them in English when they primarily spoke Spanish, and Pinson answered, "They speak English too." At the post-conviction evidentiary hearing, trial counsel testified that the Petitioner spoke "some English." The post-conviction court implicitly accredited trial counsel's testimony. Therefore, we agree with the post-conviction court's conclusion that the Petitioner failed to demonstrate trial counsel was deficient for not presenting evidence that the Petitioner could not speak English. Moreover, even if trial counsel was deficient, we agree with the post-conviction court that the Petitioner failed to show prejudice because Jobe testified that he saw the Petitioner in Jones's SUV prior to the robbery and because the Petitioner's DNA was found at the crime scene.

Next, the Petitioner claims that trial counsel was ineffective because he did not explain the State's evidence against him, the theory of criminal responsibility, and the Petitioner's options regarding a plea bargain. Trial counsel testified, though, that he met

with the Petitioner numerous times and that a Spanish-speaking investigator, Luis Acevedo, accompanied him to every jailhouse meeting. Trial counsel testified that he explained the facts of the case and the State's theory of the case to the Petitioner, that the Petitioner never advised him that the Petitioner could not understand Acevedo, and that the State did not make a plea offer. Trial counsel also testified that although he did not specifically remember explaining the theory of criminal responsibility to the Petitioner, it was his practice to do so. Again, the post-conviction court implicitly accredited trial counsel's testimony. Therefore, the Petitioner has failed to demonstrate that trial counsel was deficient.

The Petitioner claims that trial counsel was ineffective by failing to present evidence either directly or through cross-examination of the State's expert that his DNA could have been transferred to the crime scene by his codefendants. We disagree with the Petitioner. Although post-conviction counsel espoused at the evidentiary hearing that the Petitioner's codefendants transferred the Petitioner's DNA from Jones's SUV to the victim's apartment, the Petitioner testified at the hearing that he was never in the SUV. The Petitioner does not offer any other explanation on appeal as to how his DNA could have been transferred to the crime scene. In any event, as noted by the post-conviction court, the Petitioner failed to present evidence of any such transfer at the hearing. Therefore, he has failed to show that trial counsel was deficient or that he was prejudiced by any deficiency.

Finally, the Petitioner claims that trial counsel was ineffective for failing to argue that Pinson was an accomplice and for failing to request an accomplice instruction. The post-conviction court concluded that the Petitioner was not entitled to relief because he failed to show that Pinson was an accomplice. We agree with the post-conviction court.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Thus, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004) (citing State v. Lewis, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000); Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)). "[T]he test for whether a witness is an accomplice is whether the witness could have been convicted of the offense." Id.

Our review of the trial transcript shows that Pinson testified as follows: The defendants came to her apartment and told her they were going to rob someone, but she "didn't think it would really happen." The defendants left in Jones's SUV and returned to

Pinson's apartment "hours" later. The defendants knocked on her door, and she let them in. Blood was on all three of the defendants, and Tull-Morales had drugs and money. The defendants cleaned themselves up in Pinson's bathroom and "split up" the money. Pinson stated said that she got the defendants out of her apartment "as fast as [she] could," that she did not receive any drugs or money, and that she did not call the police that night because she was scared.

The Petitioner asserts that Pinson was an accomplice because she had knowledge of the robbery, because the robbery was planned in her home, because the defendants returned to her home with drugs and money, and because she continued her friendship with Tull-Morales for weeks after the robbery before she contacted the police. However, an accomplice must do more than have guilty knowledge, be morally delinquent, or even participate in a distinct but related offense. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). Here, nothing indicates that Pinson encouraged the robbery, helped with the robbery, or shared in the proceeds of the robbery. Additionally, her failure to contact the police immediately after the robbery did not make her an accomplice. See State v. Lesandru Deniesh Webster, No. M2017-00939-CCA-R3-CD, 2018 WL 1005388, at *6 (Tenn. Crim. App. at Nashville, Feb. 21, 2018). Therefore, we agree with the post-conviction court that trial counsel was not ineffective by failing to argue Pinson was an accomplice or by failing to request an accomplice instruction as to Pinson.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE